Filed 10/30/13  P. v. Fowler CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056853 |
| v. | (Super.Ct.No. FVA900431) |
| DARRELL FOWLER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  R. Glenn Yabuno, Judge.  Affirmed.

Erica Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Darrell Fowler appeals after the trial court revoked his probation. He contends the evidence was insufficient to support a finding that he violated a term of his probation. We affirm.

FACTS AND PROCEDURAL HISTORY

In 2009, defendant was charged with two counts of child abuse (Pen. Code, § 273a, subd. (a)), and one count of unlawfully taking and driving an automobile (Veh. Code, § 10851, subd. (a)). The information also alleged a prior for receiving a stolen vehicle (Pen. Code, § 496d, subd. (a)) and a strike prior (Pen. Code, §§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)). In a plea bargain, defendant pleaded no contest to one of the child abuse charges. As part of the bargain, the court imposed and suspended a six-year prison sentence. Defendant was placed on supervised probation for four years. One of the conditions of defendant's probation was that he violate no laws.

In February 2012, the People filed a petition to revoke defendant's probation, based on defendant's arrest for alleged receipt of stolen property (Pen. Code, § 496, subd. (a)). At the probation revocation hearing, the prosecution presented evidence to show that defendant had committed a new law violation. That is, in the late evening of February 13, 2012, Deputy E. Seratt was at the side of the road during a traffic stop when defendant, a pedestrian, walked toward the patrol car, with its flashing lights and spotlight illuminated. As defendant walked up, and came within speaking distance, Deputy Seratt casually asked defendant how he was doing. Defendant stopped walking and engaged in a conversation with Deputy Seratt. Eventually, Deputy Seratt asked defendant if he was on probation or parole; defendant admitted he was on probation, and

2

Deputy Seratt conducted a search after receiving defendant's permission to do so. Deputy Seratt found a wallet with keys attached in the right front pocket of defendant's jeans. The wallet contained an identification card with the name and photograph of C. Ngo. Defendant said that the wallet belonged to "[s]ome Chinese girl." Defendant claimed that she was his girlfriend, but he did not know her name.

Defendant was also in possession of other keys. In his hand, he was carrying a combination key and remote control device for a Honda vehicle. In addition, the search of defendant's jacket and jeans pockets had turned up another set of keys and a canister of mace, which was attached to a pink lanyard. Defendant identified the keys on the pink lanyard as belonging to C. Bonam, whom he characterized as "his girlfriend that he lives with." Defendant claimed that the keys with the identification wallet belonged to a "secret girlfriend." Defendant told Deputy Seratt that his "secret girlfriend" would deny being his girlfriend because she was afraid of Bonam, his "live-in girlfriend."

Investigating officers contacted Ngo about her wallet and keys. She said she had missed them about two weeks earlier. She recalled accidentally leaving the keys and attached wallet in the knob on her front door when she arrived home one day; later that same evening, when she realized what she had done, she returned to look at her front door, but the keys were already gone. Ngo asked several neighbors if they had found her keys, but no one that she asked knew anything about the keys. Eventually, Ngo replaced the lock on her door. At the hearing, Ngo testified that she did not recognize defendant and did not know anyone by his name. She had not given anyone permission to take her keys. The wallet was a designer brand that had cost a "couple hundred" dollars. Ngo

3

testified that, when the police returned the wallet and keys to her, she did not discover anything missing from the wallet.

In his defense, defendant presented the testimony of his girlfriend, Bonam. Bonam testified that defendant lived with her in her apartment; Ngo is one of their neighbors. On the evening of February 11, 2012,[1] Bonam noticed a set of keys hanging from Ngo's doorknob. She knocked on Ngo's door for "30 minutes straight," but no one answered. She left without doing anything further at that time. Bonam went back to her apartment and asked defendant what he thought she should do about the keys; defendant recommended doing nothing. About 20 minutes later, however, when Bonam saw the keys still hanging from the door, she rang the doorbell again and knocked, but got no response. She then wrote a note to Ngo and took possession of the keys. Bonam put the keys into her jacket pocket. Over the next few weeks, she tried several times to return Ngo's keys, without success.

On the night defendant was arrested, defendant was wearing Bonam's jacket because it was cold outside. Defendant testified that he was on his way to deliver groceries to an elderly woman he helped out from time to time. Defendant had not taken Ngo's keys. As far as defendant knew, Bonam's car keys were in the jacket. Although defendant admitted he told Deputy Seratt that Ngo—the person pictured on the identification card in the wallet—was his girlfriend, he only said this as a joke.

---

[1] This date presents an issue of inconsistency in the evidence. Both Bonam and Ngo placed the date the keys went missing at approximately two weeks before the night of defendant's arrest, which occurred on the late night and early morning of February 13 to 14, 2012. February 11, 2012 was only two days before defendant's arrest.

4

Defendant claimed he and Ngo were acquainted well enough that she would wave at him when he left for work, and he claimed that he had once fixed her car when it would not start.

The trial court found defendant in violation of the condition of his probation that he "violate no law," based on his possession of stolen property, i.e., Ngo's keys and wallet. (Pen. Code, § 496, subd. (a).) The court terminated defendant's probation and imposed the suspended six-year prison sentence.

Defendant filed a timely notice of appeal. He contends that the evidence is insufficient to show that Ngo's keys and wallet were stolen, and that he could therefore not have been found to have committed a new law violation (receiving stolen property).

ANALYSIS

I. Standard of Review

The standard of proof for revocation of probation is a preponderance of the evidence. (*People v. Rodriguez* (1990) 51 Cal.3d 437, 447.) The appellate court reviews the determination under the substantial evidence standard of review. (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681.) In so doing, the reviewing court accords great deference to the trial court's decision. (See *People v. Pinon* (1973) 35 Cal.App.3d 120, 123 ["Probation is not a matter of right but an act of clemency, the granting and revocation of which are entirely within the sound discretion of the trial court."].)

II.  Substantial Evidence Supported the Trial Court's Finding That Defendant

Violated His Probation

Defendant argues, first, that the evidence was insufficient to show that he violated Penal Code section 496, subdivision (a), receiving stolen property.  He argues, second, that it would be improper to uphold the revocation of his probation based upon Penal Code section 485 (theft of lost property),[2] because that statute was not alleged in the revocation petition as a basis to revoke his probation.  Finally, defendant urges that, even if Penal Code section 485 could be considered, the evidence was insufficient to support a finding that defendant violated that provision.

We need not be detained by a discussion of Penal Code section 485; even though the trial court did refer to and recite that provision, it is clear from the record that it based its finding of a violation of probation on the violation of Penal Code section 496, subdivision (a), receipt of stolen property.

The evidence at the hearing showed that Deputy Seratt searched defendant and found Ngo's wallet and keys in the right front pocket of defendant's jeans.  Despite all the defense evidence, there was no reason or explanation for why defendant would have removed Ngo's keys and wallet from Bonam's jacket and placed them in his front pants pocket.

---

[2]  Penal Code section 485 provides:  "One who finds lost property under circumstances which give him knowledge of or means of inquiry as to the true owner, and who appropriates such property to his own use, or to the use of another person not entitled thereto, without first making reasonable and just efforts to find the owner and to restore the property to him [or her], is guilty of theft."

Bonam, defendant's girlfriend, had testified in his defense that she was the one who had taken the keys and wallet from Ngo's front doorknob. She claimed she had tried several times to return the property to Ngo. Bonam's testimony made little sense, however.

For example, Bonam testified that, a few days after she had taken possession of Ngo's keys, she purposely went to the office and told the apartment manager she "wanted to return some keys." However, Bonam did not give Ngo's keys to the apartment manager. Even though the apartment manager verified that Bonam knew whose keys they were—i.e., that the keys belonged to Ngo, another tenant—Bonam still did not give the keys to the apartment manager to return to Ngo. Instead, Bonam testified, she did not "want to hand it to the manager and she all of a sudden forgets to give it to her. I wanted to explain myself why did I take it off the door." Bonam's "explanation" of why she retained possession of Ngo's keys and wallet makes no sense. For all Bonam's concern that the apartment manager might "all of a sudden forget[]" to return Ngo's keys to her, Bonam herself took possession of the keys, put them in her jacket pocket, and then casually went off to another city for two weeks, leaving the jacket (and the keys and wallet) hanging up at home. Bonam claimed that she left a note for Ngo when she first took the keys, and "numerous of notes" thereafter. Ngo apparently never found any such notes, however, even though she acknowledged that she had received cards left on her door at other times by defense investigators. Bonam's claimed need to explain personally to Ngo why she had taken the keys was illogical. She testified that her purpose in taking the keys was to "be a good Samaritan" because "a lot of strange people" might come

7

around the apartment complex. She claimed that she tried on numerous occasions to return the keys and wallet to Ngo, without success. Seeking out the apartment manager for the purpose of returning the keys, and identifying the rightful owner to the apartment manager so the keys could be returned to Ngo, would have fulfilled all of Bonam's stated purposes in taking the keys in the first place—preventing someone from harming Ngo, and returning Ngo's property to her. Nevertheless, Bonam decided to retain the keys herself instead of giving them to the apartment manager, even though the manager was a responsible party who was presumably well known to all the tenants, even though the manager would be likely to be present on the premises when Bonam would not, and, in short, when Bonam had every expectation that the apartment manager would be more likely to have success in returning Ngo's property to her than Bonam had had. The excuse that she wanted to explain personally to Ngo why she had taken the keys was just that—an excuse—because nothing would have prevented Bonam from speaking to Ngo personally even if she had turned the keys in to the apartment manager.

Ngo testified that she had to change the locks on her apartment; presumably the apartment manager would need to be made aware of the missing keys and changed locks at that time. If Bonam had told the apartment manager about Ngo's keys, as Bonam claimed, then it would be likely that the apartment manager would have mentioned that to Ngo. There was no evidence to indicate any such exchange, however. The first thing Ngo knew about her missing keys was when Deputy Quiroz returned them to her on the night of defendant's arrest.

8

Bonam also claimed to have spoken to Ngo's daughter about the keys. Bonam testified that she had seen Ngo's daughter, who attended the same school as Bonam's daughter, at the school. Bonam told Ngo's daughter to ask Ngo to come to her apartment, because Bonam had Ngo's keys. According to Bonam, Ngo's daughter responded, "Oh, okay." So far as the evidence showed, however, there was no corroboration that she had ever actually spoken to Ngo's daughter. Ngo testified that she did not know Bonam, and had never seen Bonam's daughter playing with her daughter.

Bonam testified that, on yet another occasion, she saw Ngo's mother and attempted to hand the keys to her. Ngo's mother purportedly stated, "I don't want to have nothing to do with her [*sic*]. You can talk to my daughter." She then walked away without taking the keys. Bonam testified, "I literally tried to hand it to her then," and said, "I told her, [c]an I give you the keys, and that's her exact words, I don't want to have anything to do with you. She didn't want to have anything to do with the situation and she just walked off." Ngo testified, on the other hand, that it was her mother and her daughter who had inquired of the neighbors about the missing keys. It defies reason that Ngo's mother would inquire from the neighbors about the missing keys, and yet refuse to accept the return of the keys being physically handed to her, and it is difficult to believe that Ngo's mother would never have mentioned the incident to Ngo, had it actually occurred.

Despite Bonam's testimony, the trial court was not obliged to believe her. (See *Rivard v. Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 412 ["Trial judges and juries are the exclusive judges of credibility and may disbelieve any

9

witness."]; *Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099 ["The trier of fact is the sole arbiter of all conflicts in the evidence, conflicting interpretations thereof, and conflicting inferences which reasonably may be drawn therefrom; is the sole judge of the credibility of the witnesses; [and] may disbelieve them even though they are uncontradicted if there is any rational ground for doing so, one such reason being the interest of the witnesses in the case . . . ."].) Bonam's self-interest in exonerating defendant (she was dependent upon him financially, and had a romantic or emotional involvement with him, as well as having a child together) was a rational ground upon which to disbelieve some or all of her testimony; the irrationality of Bonam's explanations and justifications was another.

The trier of fact was also entitled to disbelieve defendant's testimony. Large parts of defendant's story did not make sense. Both defendant and Bonam claimed that defendant was making a delivery of groceries to an elderly woman he helped take care of, at close to midnight on February 13, 2012. Instead of making the grocery delivery, however, defendant noticed the flashing lights of the patrol car at the traffic stop, so he decided to put the bag of groceries down next to Bonam's truck, and to wander across a field, "just being nosy to see if it was somebody that I knew that the deputy had on arrest or something out of curiosity."

Bonam insisted that she was the one who had taken Ngo's wallet and keys, and she also maintained that she placed the wallet and keys in her jacket pocket. She never removed the keys and wallet from her jacket pocket, but left the jacket hanging up at home for two weeks while she went away to Victorville. Bonam's testimony did not exonerate defendant, however, because, even if true, it provided no explanation why

10

defendant would put Ngo's keys and wallet into his front pants pocket. Defendant's own testimony was essentially to deny that he had Ngo's keys and wallet in his jeans, but that Deputy Seratt must have removed them from the jacket.

Defendant lied to Deputy Seratt about the wallet and keys: he claimed that Ngo was his girlfriend, but he did not even know her name. Defendant also claimed to know nothing about the presence of Ngo's wallet and keys in his pocket (he testified in effect that the keys had been retrieved from the jacket, and not his jeans), but he was aware enough to know that she was "[s]ome Chinese girl." Bonam made a point of testifying that the jacket belonged to her, and that it was a "unisex" jacket. She testified that she is the only person who wears the jacket, but then immediately said that the "[o]nly reason [defendant] had it that day is because it was cold. He grabbed a jacket off the coat rack and went to deliver the groceries to the lady he take care of [*sic*]." The trier of fact was not required to believe that the jacket was in fact Bonam's.

Defendant was found in possession of a designer brand wallet worth a "couple hundred" dollars. He lied to the police about the circumstances of his possession of the wallet, and the trier of fact had reason to doubt the truth of his testimony at the hearing. Though there was no direct evidence that defendant himself stole the wallet and keys, there were inconsistencies in the defense testimony, and Bonam's claims that she attempted to return the wallet and her explanations about why she kept it could reasonably have been rejected by the trier of fact.

The evidence, together with reasonable inferences therefrom, was more than sufficient to support a finding that defendant had committed a new law violation,

11

receiving stolen property.  The court therefore properly revoked defendant's probation and imposed the sentence that had been previously suspended.

## DISPOSITION

Substantial evidence supported the trial court's finding that defendant had violated his probation by committing a new law violation.  The order revoking his probation is affirmed; the imposition of the suspended sentence was proper.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                                    Acting P. J.

We concur:


RICHLI
                    J.


CODRINGTON
                    J.